Ronald T. **PHILLIPS** et al., **Appellants,**

v.

**BUREAU OF PRISONS** et al.

**No. 76–2142.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 14, 1977.
Decided Jan. 15, 1979.

24. See text *supra* at note 6.

William H. Allen, Washington, D. C., with whom Mark D. Herlach, Washington, D. C., was on the brief, for appellants.

Mitchell B. Dubick, Atty., Dept. of Justice, Washington, D. C., with whom George W. Calhoun, Atty., Dept. of Justice, Washington, D. C., was on the brief, for appellees.

Before BAZELON, LEVENTHAL and ROBINSON, Circuit Judges.

Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Ronald T. Phillips is one of a number of paralegal staff assistants employed by the National Prison Project, an organization engaged in the provision of legal services to prisoners.[1] The duties assigned Project paralegals include interviewing prisoners who are witnesses in pending cases or present or prospective clients of attorneys associated with the Project. Envisioning this role for Phillips, himself a former federal prisoner, the Project sought permission from the Bureau of Prisons for Phillips to enter federal penal institutions for the purpose of conducting such interviews.[2] By letter, the Bureau promptly denied the Project's request.[3]

Shortly thereafter, this litigation was launched in the District Court by Phillips, the Project and its executive director, and three federal inmates who are clients of the Project.[4] Characterizing Phillips' exclusion as arbitrary, their complaint demanded declaratory and injunctive relief. The court, deeming the Bureau's action "a reasonable exercise of . . . discretion," dismissed the suit for lack of a claim upon which relief could be granted,[5] whereupon this appeal was taken.[6]

We are mindful that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[7] We think, however, that stringent standard has been met here and, accordingly, we affirm the judgment of dismissal.

1. The Project is a creature of the American Civil Liberties Union Foundation, a nonprofit tax-exempt New York corporation.

2. The Bureau functions under the direction of the Attorney General in the management and regulation of all nonmilitary federal penal and correctional institutions. 18 U.S.C. §§ 4041–4042 (1976).

3. Joint Appendix (J.App.) 9–10.

4. The named defendants, appellees here, are the Bureau and its director and general counsel, hereinafter usually referred to collectively as "the Bureau."

5. Pursuant to Fed.R.Civ.P. 12(b)(6). *Phillips v. Bureau of Prisons,* Civ. No. 76–0790 (D.D.C. Sept. 22, 1976) (unpublished order), J.App. 33.

6. We are confronted at the threshold by the Bureau's argument that this controversy is nonjusticiable because the terms of Phillips' unexpired parole require him to obtain permission before leaving the area specified in his certificate of parole, a dispensation he has not procured. We need not reach the merits of the Bureau's legal thesis, however, for the record takes away its essential factual support. Before the Parole Commission will approve any request to leave the area, Phillips must show that the prison to which he would travel has authorized his visit. Letter from Joseph Nardoza, Commissioner, United States Parole Commission, to Phillips' counsel (Sept. 21, 1976), Appellants' Reply Brief attachment A. It cannot be doubted, then, that Phillips has felt the Bureau's exclusionary action "in a concrete way." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967).

7. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1955). See, e. g., *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90, 96 (1974); *Alley v. Dodge Hotel,* 163 U.S.App.D.C. 320, 323, 501 F.2d 880, 883 (1974); *Jones v. Rogers Memorial Hosp.,* 143 U.S.App.D.C. 51, 53, 442 F.2d 773, 775 (1971).

## I. THE FACTUAL BACKGROUND

█ The posture of the case constrained the District Court—as it does us—to accept the truth of the well-pleaded factual allegations of the complaint.[8] We are mindful, too, that when passing on a motion attacking the legal efficacy of the plaintiff's statement of his claim, the court may properly look beyond the complaint only to items in the record of the case or to matters of general public record.[9] We accordingly confine ourselves largely to the contents of the complaint, including prominently the text of the Bureau's letter-decision incorporated therein,[10] in distilling the factual predicate for resolution of this appeal.

In responding to the Project's request on Phillips' behalf, the Bureau emphasized that it had no general policy of automatically excluding ex-offenders from paralegal activity inside federal prisons.[11] On the contrary, the Bureau declared, each such application is considered on its own merits.[12] Phillips was refused permission, the Bureau said, principally because of his disciplinary record during his seven years of federal incarceration.[13] While confined, Phillips had taken part in several serious institutional disturbances, playing a leadership role in at least two of them.[14] These incidents included an attempt to incite a work stoppage, encouraging and engaging in other group demonstrations, endeavoring to introduce contraband into a segregation unit, threatening bodily harm, and "fighting, refusing orders, and possession of a stolen radio."[15] In the Bureau's view, this history revealed Phillips as "disruptive and a poor influence on other inmates,"[16] and por-

8. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557, 561 n. 2 (1977); *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1082, 31 L.Ed.2d 263, 268 (1972); *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404, 416 (1969); *United States v. Mississippi,* 380 U.S. 128, 143, 85 S.Ct. 808, 816, 13 L.Ed.2d 717, 727 (1965). *Cf. Pauling v. McElroy,* 107 U.S.App.D.C. 372, 373–374, 278 F.2d 252, 253–254, *cert. denied,* 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960).

9. See 5 C. Wright & A. Miller, Federal Practice, § 1357 at 593 (1969) and cases cited.

10. Letter from Clair A. Cripe, General Counsel, Bureau of Prisons, to Alvin J. Bronstein, Executive Director, National Prison Project (Jan. 29, 1976). J.App. 9–10. See Fed.R.Civ.P. 10(c).

11. *Id.* at 1, J.App. 9.

12. *Id.,* J.App. 9.

13. In this regard the Bureau's letter said:
 Mr. Phillips has a lengthy criminal record, including violation of parole on three occasions. However, this is not our primary concern. In your letter you indicate that Mr. Phillips' disciplinary record while he was a federal prisoner is "totally irrelevant." His disciplinary record while in custody is our major concern. It reveals a long history of disciplinary actions of a certain type. During the course of his imprisonment, he took part in three major institutional disturbances in three penitentiaries, and played a leadership role in two and maybe three of these. The first such disturbance occurred February 15, 1972, at Lewisburg Penitentiary. During this incident, Mr. Phillips led some 200 inmates in a work stoppage, and was subsequently found guilty by the discipline committee of attempting to incite a work stoppage. For his part in this disturbance he forfeited 30 days statutory good time, and the committee suspended the forfeiture of an additional 386 days. In May of 1972 Mr. Phillips and 10 other inmates went on a hunger strike and were removed from segregation to the hospital. On July 11, 1972, Mr. Phillips was transferred to the McNeil Island Penitentiary. Here on December 11, 1972, Mr. Phillips was charged with encouraging demonstrations and refusing to work. He admitted the latter. No good time was taken for this offense.
 On February 12, 1973, Mr. Phillips received another incident report for attempting to introduce contraband into the segregation unit. He was transferred on February 15 to Leavenworth Penitentiary.
 The third major misconduct report occurred at Leavenworth on October 11, 1973. Mr. Phillips was charged with threatening bodily harm, refusing to obey an order, and engaging in a group demonstration. He was found to have committed these acts, and as a result forfeited 180 days statutory good time.
 In addition to these major disciplinary infractions, Mr. Phillips has numerous other incident reports for fighting, refusing orders, and possession of a stolen radio.
 *Id.* at 1–2, J.App. 9–10.

14. *Id.* at 1–2, J.App. 9–10, quoted *supra* note 13.

15. *Id.*

16. *Id.* at 2, J.App. 10.

trayed a relevant "course of conduct" which the Bureau could not "responsibly ignore." [17]

The complaint recounted, without controverting in any manner, this recitation of Phillips' record as a federal inmate. This may be explained by appellants' consistent position that Phillips' past should be irrelevant to determination of whether he should be granted entry into federal prisons, and that only his post-release record should be considered.[18] The Bureau responds by noting that when the Project's request was acted on Phillips had been paroled only three months earlier [19] and therefore that his prison record was a necessary determinant in their predictive decision to deny him access in order to safeguard order and discipline in the institutions under their charge.

Appellants complained to the District Court that the Bureau's decision trespassed on rights secured to them by the Constitution. We examine, in turn, each of their several claims and—as we are obliged to do [20]—such additional theories of recovery that the factual averments of their complaint might support. In the end, we conclude that none can prevail.

## II. PHILLIPS' CLAIMS

Phillips maintains that the Bureau's decision deprived him of liberty and property without due process of law in violation of the Fifth Amendment. He asserts that the Bureau's action was taken without reference to any established standard. He insists, too, that it was arbitrary because unaccompanied by any showing that he actually presented a threat to prison security.[21]

### A. The Right Involved

■ It cannot be gainsaid that Phillips enjoys an interest in the pursuit of his newly-found vocation commanding a measure of constitutional protection. His want is to function as a paralegal, and he has manifested an interest in working with prisoners, many of whom, of course, are kept in federal facilities. No one can deny that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment . . . .." [22] To be sure, the right to ply the paralegal's trade does not per se entail a concomitant right to freely enter federal prisons to do so; the Bureau need not afford opportunities to realize one's occupational aspirations.[23] But the Bureau may not capriciously foreclose to particular individuals opportunities that it has previously and independently created generally for others.[24]

---

**17.** *Id.*

**18.** Brief for Appellants at 21–22 & n. 6. When the Project's application was submitted to the Bureau, Phillips had already visited some non-federal prisons as a paralegal. Complaint ¶ 12, J.App. 4. We are told that two ex-offenders employed by the Project, one of whom is Phillips, have visited such institutions 34 times without incident. Brief for Appellants at 21.

**19.** Brief for Appellees at 17–18. This, of course, is a matter of public record. See note 9 *supra* and accompanying text.

**20.** See, *e. g., Robertson v. Johnston,* 376 F.2d 43, 44–45 (5th Cir. 1967); *Jacobson v. Tahoe Regional Planning Agency,* 558 F.2d 928, 938 (9th Cir. 1977). *Cf. SCM Corp. v. Xerox Corp.,* 507 F.2d 358, 362 (2d Cir. 1974) (in passing on motion for preliminary injunction, unlike motion to dismiss, court need not consider all conceivable grounds for relief not specified in the motion).

**21.** As we later observe, Phillips does not advance any First Amendment contention, nor could he succeed thereon if he had. See note 62 *infra.*

**22.** *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377, 1388 (1959).

**23.** See, *e. g., Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978). *Cf. McCray v. Sullivan,* 509 F.2d 1332, 1334 (5th Cir.), *cert. denied,* 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975) (prison officials cannot be forced to provide a general right to conjugal visits).

**24.** See *Thomas v. Brierley,* 481 F.2d 660, 661 (3d Cir. 1973) (right to visitation may not be denied on the basis of inmate's race); *Hamilton v. Saxbe,* 428 F.Supp. 1101, 1112 (N.D.Ga.1976) (Bureau does not have totally free rein in excluding visitors). See generally *Homer v. Richmond,* 110 U.S.App.D.C. 226, 229, 292 F.2d 719,

A critical factor in our present analysis is that paralegals ordinarily may enter federal penal institutions for conferences with inmates related to legal business. The Bureau has a long-standing policy [25] of extending visitation privileges liberally to attorneys.[26] Paralegals, treated identically [27] save for required supervision by an attorney,[28] are "routinely granted access to federal prisoners." [29] Indeed, visits of all sorts are encouraged except when their denial becomes "necessary to insure the security, good order, and discipline of the institution." [30] Hence, "consistent, positive action of government officials" has created "a justifiable expectation that the only basis for the government's refusal to grant" [31] entrance is concern for internal security, order and discipline.[32] Put another way, "rules or

mutually explicit understandings" [33] have given rise to a "legitimate claim of entitlement." [34] Phillips has alleged facts making out this much, and it is too early in the litigation to be certain that he is wrong.

## B. The Balance of Interests

 Nonetheless, while we believe that paralegals enjoy the safeguard of due process for their general entitlement to enter federal prisons to function as such, we are satisfied that the Bureau's decision to exclude Phillips was faithful to a constitutionally permissible standard and was reached by constitutionally acceptable means. And we reject the suggestion that the Bureau must demonstrate that Phillips, if admitted,

722 (1961), quoted in *Cafeteria Workers Local 473 v. McElroy,* 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1235 (1961) ("[o]ne may not have a constitutional right to go to Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law").

25. Bureau regulations affecting inmates are presently contained in policy statements and operations memoranda available to inmates in each institution's inmate law library and to the general public on request. 42 Fed.Reg. 26334 (1977). Until recently, most of such regulations had not been published in the Federal Register. *Id.* On May 22, 1977, the Bureau gave notice of intent to publish these regulations in the Federal Register as proposed rules, *id.,* and in that form set forth the regulations pertaining to inmate access to and visitation by legal counsel and their assistants. *Id.* at 26337–26338, 26345–26346. From this source one may readily obtain the details of existing policies and regulations bearing on these matters.

26. See *Saxbe v. Washington Post Co.,* 417 U.S. 843, 846, 94 S.Ct. 2811, 2813, 41 L.Ed.2d 514, 517–518 (1974). The proposed regulations provide that prison wardens "generally may not limit the frequency of attorney visits." 42 Fed. Reg. 26338 (1977) (proposed 28 C.F.R. § 540.-46(b)), and that while the attorney may be searched he may not be asked the subject matter of the interview or subjected to "auditory supervision." *Id.* (proposed 28 C.F.R. § 540.-46(d)–(f)).

27. See Department of Justice, Draft Federal Standards for Corrections (1978) ("[c]orrectional authorities should . . . assist [ ] inmates in making confidential contacts with

attorneys *and their authorized representatives*" (emphasis supplied)).

28. 42 Fed.Reg. 26346 (1977) (proposed 28 C.F.R. § 543.6). An attorney must furnish a signed statement describing the paralegal's ability to perform the involved duties and knowledge of his responsibilities. The attorney must also agree to supervise the paralegal and to accept responsibility for his actions. *Id.* (proposed 28 C.F.R. § 543.6(b)). The paralegal himself must pledge to abide by the institution's regulations and may be excluded "if necessary to maintain security and good order." *Id.* (proposed 28 C.F.R. § 543.6(b)(3)).

29. Complaint ¶ 12, J.App. 4.

30. 42 Fed.Reg. 26337–26338 (1977) (proposed 28 C.F.R. § 540.4).

31. *Sherrill v. Knight,* 186 U.S.App.D.C. 293, 300 n. 22, 569 F.2d 124, 131 n. 22; accord, *White v. Keller,* 438 F.Supp. 110, 120 (D.Md. 1977) ("[w]here a state purports to confer a significant benefit on an individual and in so doing creates a reasonable expectancy that the benefit will be of a continuing nature, any attempt to deprive the individual of the benefit must be accompanied by due process in order to prevent the arbitrary administration of the laws").

32. See *Colm v. Vance,* 186 U.S.App.D.C. 132, 138–139, 567 F.2d 1125, 1131–1132 (1977).

33. *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570, 580 (1972).

34. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972).

would actually upset institutional tranquility.

■ The Bureau's decision made reasonably clear that Phillips was refused ingress because his prison record disclosed his disruptive proclivities and led Bureau officials to consider him a serious threat to the stability of conditions essential to prison security.[35] The Bureau's governing standard—that paralegals may be kept out when that is adjudged necessary to insure discipline and good order [36]—strikes us as definite as protection of the governmental interest, involving as it does a predictive determination, permits, and is sufficiently precise to satisfy constitutional demands.[37] As the Supreme Court has acknowledged, "[b]ecause the realities of running a penal institution are complex and difficult, we have . . . recognized the wide-ranging deference to be accorded the decisions of prison administrators."[38] And as the Court has underscored, "central to all other

corrections goals is the institutional consideration of internal security within the corrections facilities themselves."[39] In sum, the judiciary is duty bound to uphold the reasonable judgments of responsible officials on that score.[40]

■ Phillips argues, however, that the Bureau's failure to *demonstrate* that he would disrupt order and discipline in federal facilities to which he might be admitted as a paralegal renders his exclusion constitutionally infirm.[41] This position misallocates the burden of proof. Nothing in the Constitution compelled the Bureau, in order to sustain its decision to exclude Phillips, to prove to the satisfaction of a judge that he actually posed a threat to prison security. As the Supreme Court has declared, "[t]he necessary and correct result of [judicial] deference to the informed discretion of prison administrators permits them, not the courts, to make the difficult judgments concerning institutional operations in situations

35. See text *supra* at notes 13–17 and note 13. Compare *Pell v. Procunier,* 417 U.S. 817, 831–832, 94 S.Ct. 2800, 2808–2809, 41 L.Ed.2d 495, 506–507 (1974) (interviews causing "severe disciplinary problems").

36. See text *supra* at notes 13–17 and note 13.

37. See *Sherrill v. Knight, supra* note 31, 186 U.S.App.D.C. at 299, 569 F.2d at 130 ("the governmental interest here [protection of the President] does not lend itself to detailed articulation of narrow and specific standards or precise identification of all the factors which may be taken into account in applying this standard").

38. *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629, 638–639 (1977). Compare *Procunier v. Martinez,* 416 U.S. 396, 404–405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224, 235–236 (1974):

Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the ex-

tent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism.

(footnotes omitted).

39. *Pell v. Procunier, supra* note 35, 417 U.S. at 823, 94 S.Ct. at 2804, 41 L.Ed.2d at 502.

40. See, *e. g., Jones v. North Carolina Prisoners' Union, supra* note 38, 433 U.S. at 126, 97 S.Ct. at 2538, 53 L.Ed.2d at 638–639; *Procunier v. Martinez, supra* note 38, 416 U.S. at 405, 94 S.Ct. at 1807, 40 L.Ed.2d at 235–236; *Cruz v. Beto, supra* note 8, 405 U.S. at 321, 92 S.Ct. at 1081, 31 L.Ed.2d at 267. Compare *Main Road v. Aytch,* 522 F.2d 1080 (3d Cir. 1975), *later appeal,* 565 F.2d 54 (3d Cir. 1977).

41. Brief for Appellants at 21–23.

such as this."[42] Consequently, a "further requirement of a demonstrable showing that [Phillips] was in fact harmful is inconsistent with the deference federal courts should pay to the informed discretion of prison officials."[43] Concededly, the Bureau's decision would be vulnerable were it arbitrary or patently unreasonable.[44] But at no time has Phillips pleaded or even suggested facts that might serve to indicate that such is the case.[45]

Phillips has not questioned the sufficiency of the procedures by which he was refused access to federal penal institutions. Nonetheless, our duty to accord his complaint a liberal reading and to consider all legal theories his factual allegations might conceivably support[46] leads us to inquire in that regard. We start with the proposition that "notice to the unsuccessful applicant of the factual bases for denial with an opportunity to rebut is a minimum prerequisite for ensuring that the denial"[47] is in furtherance of the interest in preserving prison order rather than based on some arbitrary or unacceptable reason. The Bureau's letter-decision satisfied the first mandate, and we are persuaded that the second also has been met. The Bureau has made clear that it was open to further submissions, either by Phillips or the Project, that might rebut the factual predicates for the decision.[48] Neither ever sought a fuller hearing by the Bureau, nor has Phillips claimed that he was precluded from presenting to the Bureau any favorable information he might have.[49] Indeed, never—either to the Bureau, the District Court or this court—has Phillips even suggested that the Bureau's characterization of his prison record is inaccurate. We recognize that the Bureau is legally required to supply a statement of reasons explaining any denial of access after rebuttal material has been put forward.[50] Because, however,

42. *Jones v. North Carolina Prisoners' Union, supra* note 38, 433 U.S. at 128, 97 S.Ct. at 2539, 53 L.Ed.2d at 640. See *Pell v. Procunier, supra* note 35, 417 U.S. at 827, 94 S.Ct. at 2806, 41 L.Ed.2d at 504; cases cited note 40 *supra.*

43. *Jones v. North Carolina Prisoners' Union, supra* note 38, 433 U.S. at 136, 97 S.Ct. at 2543, 53 L.Ed.2d at 645.

44. *E. g., Procunier v. Martinez, supra* note 38, 416 U.S. at 419–422, 94 S.Ct. at 1814–1815, 40 L.Ed.2d at 243–245.

45. Phillips also asserts that he has been denied the equal protection of the laws shielded against federal action by the Fifth Amendment. Brief for Appellants at 23–26. This claim need not detain us long, for refusing admittance to paralegals who constitute a threat to prison security while granting it to those who do not is certainly not an arbitrary distinction. See cases cited *supra* at note 42.

46. See note 20 and accompanying text.

47. *Sherrill v. Knight, supra* note 31, 186 U.S. App.D.C. at 300, 569 F.2d at 131. See also *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976) ("due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail").

48. J.App. 29. See also Brief for Appellees at 6 & n. 7.

49. Phillips is of course free to reapply for permission to enter the federal prisons as a paralegal. At such time as he might do so, his post-release record could convince the Bureau to grant his request.

50. In *Sherrill v. Knight, supra* note 31, 186 U.S.App.D.C. at 299–300, 569 F.2d at 130–131, we held that due process mandated this. *Sherrill,* however, involved press passes and substantial First Amendment considerations, and thus perhaps more process was due. Since the case at bar does not have the same accompaniments, the constitutional consequence is less clear. See *id.* at 300 n. 22, 569 F.2d at 131 n. 22. Closer to *Sherrill* would be exclusion of an attorney retained by a prisoner, implicating substantial Sixth Amendment rights. A paralegal is not necessarily in the same position; he serves in aid of counsel, but so also might counsel's secretary. It cannot be gainsaid, however, that access of a paralegal may have a constitutional predicate in particular fact situations, so even the generalized claim has a constitutional aura.

We need not pursue the due process inquiry to a ruling, for the Administrative Procedure Act, 5 U.S.C. § 555(e) (1976), provides:

neither Phillips nor the Project sought to provide the Bureau with any such information, this requirement was never called into play.[51]

## III. CLAIMS OF THE OTHER APPELLANTS

### A. Resort to the Courts

The appellant inmates assert that the ban on Phillips' paralegal services in federal correctional institutions deprives them of their constitutional right to resort to the courts.[52] To be sure, the Due Process Clauses insure to prisoners,[53] federal and state, "meaningful access"[54] to the courts for the presentation of their legal grievances.[55] But this does not mean that paralegals must automatically be admitted into penal institutions, for governmental officials are free to adopt any of several methods to achieve the constitutional goal.[56] Beyond that, "[t]he extent to which [the right of access of the courts] is burdened by a particular regulation or practice must be weighed against the legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials."[57]

Plainly, we cannot rule that prisoners have a constitutional right to communicate face-to-face with a paralegal who officially and not unreasonably has been determined to be a danger to prison order. The claim of that right fails here for precisely the same reasons denuding the claim of a correlative right by Phillips himself.[58] The governmental interest in prison security is equally strong in both instances, as is the obligation of judicial deference.[59] Furthermore, the decision under attack, excluding as it does but a single paralegal from federal prisons, in no way suggests that federal inmates do not enjoy alternative means of access to the courts just as suitable.[60] Other paralegals, perhaps even some who are ex-offenders, as well as members of the bar, remain available to assist these appellants in pursuing their legal remedies. The balance of interests thus leans heavily and decisively on the side of the Bureau.

### B. Freedom of Speech and Association

The prisoner-appellants also suggest that the Bureau's action unconstitu-

---

Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial.

It cannot be doubted, then, that the Bureau must supply a statement of reasons when it denies the application of a paralegal who has appropriate sponsorship of a qualified attorney whose right to access is not disputed.

**51.** Compare *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

**52.** Brief for Appellants at 26–29.

**53.** See *Wolff v. McDonnell,* 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935, 964 (1974).

**54.** *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72, 80 (1977), quoting *Ross v. Moffitt,* 417 U.S. 600, 611, 615, 94 S.Ct. 2437, 2444, 2446, 41 L.Ed.2d 341, 351, 353 (1974).

**55.** *Bounds v. Smith, supra* note 54, 430 U.S. at 823–828, 97 S.Ct. at 1495–1498, 52 L.Ed.2d at 79–83; *Procunier v. Martinez, supra* note 38,

416 U.S. at 419–422, 94 S.Ct. at 1814–1815, 40 L.Ed.2d at 243–245; *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969).

**56.** *Bounds v. Smith, supra* note 54, 430 U.S. at 830–832, 97 S.Ct. at 1499–1500, 52 L.Ed.2d at 84–85; *Johnson v. Avery, supra* note 55, 393 U.S. at 488–490, 89 S.Ct. at 750–751, 21 L.Ed.2d at 723–724.

**57.** *Procunier v. Martinez, supra* note 38, 416 U.S. at 420, 94 S.Ct. at 1815, 40 L.Ed.2d at 244.

**58.** See text *supra* at notes 35–45.

**59.** See text *supra* at notes 35–45.

**60.** See cases cited *supra* note 56. In *Procunier v. Martinez, supra* note 38, the Court invalidated an absolute ban on the use by attorneys of paralegals or law students to interview inmate clients. 416 U.S. at 419–422, 94 S.Ct. at 1814–1815, 40 L.Ed.2d at 243–245. The Court specifically noted that the bar "was not limited to prospective interviewers who posed some colorable threat to security . . . ." *Id.* See also *Souza v. Travisono,* 498 F.2d 1120, 1123 n. 5 (1st Cir. 1974).

tionally abridged their speech and associational liberties secured by the First Amendment.[61] The intended purpose of Phillips' proposed excursions into federal prisons is to interview witnesses and present or prospective clients of Project attorneys—contacts implicating speech and association for both Phillips and the inmates involved.[62] We cannot believe, however, that these ingredients of the interview serve to elevate the prior entry into the prison complex to the status of a First Amendment right inhering in either.

An act does not necessarily take on characteristics invoking the First Amendment simply because if taken it may usher in another episode plainly possessing First Amendment elements. This is neatly illustrated by the Supreme Court's disposition in *Zemel v. Rusk*[63] of a claim that denial of a validated passport for travel to Cuba directly interfered with the would-be traveler's ability to learn first-hand the effects abroad of American policies and the conditions abroad that might affect those policies. The Court explained:

> We must agree that the Secretary's refusal to validate passports for Cuba renders less than wholly free the flow of information concerning that country.

While we further agree that this is a factor to be considered in determining whether appellant has been denied due process of law, we cannot accept the contention of appellant that it is a First Amendment right which is involved. For to the extent that the Secretary's refusal to validate passports for Cuba acts as an inhibition (and it would be unrealistic to assume that it does not), it is an inhibition of action. There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak and publish does not carry with it the unrestrained right to gather information.[64]

Withholding of permission to come into a federal prison, no less than refusal of a validated passport to Cuba or of admission to the White House, is "an inhibition of action." And no more than travel to Cuba

---

**61.** Brief for Appellants at 30–32.

**62.** Phillips has not argued that the Bureau's action infringed his First Amendment freedom, even though as one no longer in prison he enjoys the plenary protection of that Amendment. That argument, if made, would not avail Phillips, however. See text *infra* at notes 63–71. See also *Houchins v. KQED, Inc., supra* note 23, 438 U.S. at 10, 98 S.Ct. at 2595, 57 L.Ed.2d at 562–563; *Jones v. North Carolina Prisoners' Union, supra* note 38, 433 U.S. at 136, 97 S.Ct. at 2543, 53 L.Ed.2d at 645; *Saxbe v. Washington Post Co., supra* note 26, 417 U.S. at 850, 94 S.Ct. at 2815, 41 L.Ed.2d at 519–520; *Pell v. Procunier, supra* note 35, 417 U.S. at 829–834, 94 S.Ct. at 2807–2810, 41 L.Ed.2d at 505–509. See generally *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).

**63.** 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).

**64.** *Id.* at 16–17, 85 S.Ct. at 1280–1281, 14 L.Ed.2d at 190 (footnote omitted). Accord, *Berrigan v. Sigler,* 162 U.S.App.D.C. 378, 383–384, 499 F.2d 514, 519–520 (1974), where we said:

> While we must remain sensitive to the overriding importance of First Amendment rights in the evaluation of restrictions that may be even tangentially related, the enforcement of legitimate regulations must not be diluted or rendered impractical because as an incident to their application speaking, association or writing may be affected. Under the guise of exercising the First Amendment right of free speech, a person may not reposition himself where he otherwise would have no authority to be. Nor can one in reliance upon freedom of the press, by virtue of that reliance alone, legally seize without consideration or lawful warrant the plant of a newspaper belonging to another; it would be one thing to expect to use the columns of the paper to voice views and opinions under appropriate conditions, quite another to move without authority into another's plant for the purpose.

See also *Kent v. Dulles,* 357 U.S. 116, 126–127, 78 S.Ct. 1113, 1118–1119, 2 L.Ed.2d 1204, 1210–1211 (1958).

or entry into the White House to augment one's store of information does Phillips' anticipated face-to-face consultation with an inmate "make entry into" a federal penal facility "a First Amendment right."[65] Concisely put, there is no "First Amendment easement"[66] along which Phillips can wend his way inside the prison walls. To boot, "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration;"[67] and "challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law."[68] Moreover, the availability of alternative means of communication is a relevant factor when a court is called upon to balance the First Amendment rights of prisoners against the legitimate governmental interests served by particular restrictions on those liberties.[69] The Bureau's standard excluding paralegals like

Phillips is tailored to serve an important governmental interest,[70] and other avenues of communicating with Phillips—such as the mail—remain fully available.[71] We conclude that the inmates' First Amendment claim is insubstantial.

## C. Practice of Law

 Lastly, the Project and its executive director, who is an attorney, charge that Phillips' exclusion from federal penal facilities unconstitutionally interferes with their right to practice law.[72] Charitably construed, this contention amounts to an assertion that the procedures by which Phillips was denied access were deficient and consequently that Project attorneys were deprived of a constitutionally protected liberty or property interest through loss of his services.[73] It is evident that the Bureau's action did not disable Project attorneys more than infinitesimally from engaging "in any of the common occupations of life . . .."[74] And we have already held that the method by which the Bureau's decision was reached satisfied Fifth Amend-

---

**65.** We think it significant that in its only two decisions bearing on prisoner efforts to obtain legal assistance through means necessarily involving elements of speech and association, the Supreme Court dealt with the problem as a matter of prisoner-right of access to the courts rather than in terms of the First Amendment. *Procunier v. Martinez, supra* note 38, 416 U.S. at 419–422, 94 S.Ct. at 1814–1815, 40 L.Ed.2d at 243–245; *Johnson v. Avery, supra* note 55.

**66.** Kalven, *The Concept of a Public Forum: Cox v. Louisiana*, 1965 Sup.Ct.Rev. 1, 13.

**67.** *Jones v. North Carolina Prisoners' Union, supra* note 38, 433 U.S. at 125, 97 S.Ct. at 2538, 53 L.Ed.2d at 638. See also *Pell v. Procunier, supra* note 35, 417 U.S. at 822, 94 S.Ct. at 2804, 41 L.Ed.2d at 501.

**68.** *Pell v. Procunier, supra* note 35, 417 U.S. at 822, 94 S.Ct. at 2804, 41 L.Ed.2d at 501.

**69.** *Id.* at 824, 94 S.Ct. at 2805, 41 L.Ed.2d at 502. See also *Kleindienst v. Mandel*, 408 U.S. 753, 765, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683, 693 (1972); *Seattle-Tacoma Newspaper Guild, Local 82 v. Parker*, 480 F.2d 1062, 1067 (9th Cir. 1973).

**70.** See notes 35–45 *supra* and accompanying text.

**71.** Compare *Jones v. North Carolina Prisoners' Union, supra* note 38, 433 U.S. at 131–133, 97 S.Ct. at 2541–2542, 53 L.Ed.2d at 642–643; *Pell v. Procunier, supra* note 35, 417 U.S. at 823–828, 94 S.Ct. at 2804–2807, 41 L.Ed.2d at 502–505.

**72.** See Brief for Appellants at 33–34; Complaint ¶ 19, J.App. 6.

**73.** The Project may be advancing a substantive due process claim. See *Keker v. Procunier*, 398 F.Supp. 756, 760–761 (E.D.Cal.1975), cited in Brief for Appellants at 33. If the Project's thesis is that it has a due process right to require Phillips' admittance into federal prisons, we are unable to subscribe. See Part II *supra*. See generally *Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

**74.** *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923). See *Board of Regents v. Roth, supra* note 34; *Cafeteria Workers Local 473 v. McElroy, supra* note 24; *Mazaleski v. Truesdell*, 183 U.S.App.D.C. 182, 562 F.2d 701 (1977).

ment requirements.[75] We think no more need be said on this aspect of the case.

## IV. CONCLUSION

We hold today that appellants do not possess a constitutional right to compel the admittance into federal correctional facilities of a paralegal who in the considered judgment of prison officials constitutes a present, serious threat to institutional security. Insofar as appellants' claims rest on a challenge to the Bureau's characterization of Phillips as such a danger, they have failed because their complaint does not contain "a . . . statement . . .

showing that [they are] entitled to relief." [76] Because appellants have not sought leave to amend their complaint in either this court or the court below, this litigation draws to an end.[77] For the reasons elucidated above,[78] the judgment appealed from is

*Affirmed.*

---

**75.** See notes 46–51 *supra* and accompanying text.

**76.** Fed.R.Civ.P. 8(a).

**77.** Compare *National Union of Hosp. & Health Care Employees v. Carey,* 557 F.2d 278 (2d Cir. 1977) (where no request for permission to amend complaint was made after it was dismissed by district court, and where there was no disclosure of what additional allegations might be made which would lead to a different result, court of appeals would not grant leave to amend complaint) with *Griggs v. Hinds Junior College,* 563 F.2d 179 (5th Cir. 1977) (district court abused discretion by refusing to grant leave to amend after dismissing com-

plaint when motion for leave to amend was timely made).

**78.** In light of our disposition of this appeal, we do not reach appellants' contention that judicial review of the Bureau's decision should have been de novo instead of confined to a search for substantial supporting evidence in the administrative record underlying the Bureau's decision. Compare *Quaker Action Group v. Hickel,* 148 U.S.App.D.C. 346, 351–354, 460 F.2d 854, 859–862 (1971) with *Doraiswamy v. Secretary of Labor,* 180 U.S.App.D.C. 360, 367–370, 555 F.2d 832, 839–842 (1976).