**Preness CRUSOE, Plaintiff-Appellant,**

v.

**Richard W. DeROBERTIS,
Defendant-Appellee.**

**No. 82–2013.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 15, 1983.

Decided Aug. 22, 1983.

---

Before BAUER and WOOD, Circuit Judges, and VAN PELT, Senior District Judge.*

VAN PELT, Senior District Judge.

This appeal comes to us from the district court[1] which denied Appellant, Preness Crusoe, injunctive relief under 42 U.S.C. § 1983 relating to the exclusion of a para-professional employed by Appellant's counsel from the prison in which Appellant is incarcerated.

Appellant is an inmate at the Stateville Correctional Center, Joliet, Illinois. Stateville is a maximum security institution. The para-professional excluded from the prison was Charles McClindon, a former inmate at Stateville.

On appeal Appellant raises the following issue:

1. Whether a prison warden may, consistent with a prisoner's First Amendment right to communicate, refuse to permit a para-professional employed by the prisoner's attorney from entering the prison merely because the para-professional is an ex-offender.

Appellant also argues that the facts of this case do not demonstrate that the para-professional created a colorable threat to security.

## I

Charles McClindon, the para-professional, is an ex-offender who has served sentences in the Illinois Department of Corrections for a number of offenses, including burglary, larceny, confidence games, narcotics, armed robbery, and murder.[2] He was released in October, 1978, and thereafter was employed by Appellant's counsel as a para-professional. McClindon's duties included interviewing prisoners at Stateville. McClindon's status as an ex-offender appar-

Kenneth N. Flaxman, Chicago, Ill., for plaintiff-appellant.

Michael T. Mullen, Chicago, Ill., for defendant-appellee.

---

* Robert Van Pelt, Senior District Judge for the District of Nebraska, sitting by designation.

1. The Honorable Susan Getzendanner, United States District Judge for the Northern District of Illinois presiding.

2. McClindon's conviction for murder was reversed, *United States ex rel. McClindon v. Warden*, 575 F.2d 108 (7th Cir.1978). He was granted a new trial where he was found not guilty.

ently enabled him to communicate effectively with the Stateville inmates.

In October, 1981, Appellee Richard W. DeRobertis, Warden of Stateville, received and accepted a recommendation that a stop order be issued prohibiting McClindon's further entry to Stateville. The action was based upon McClindon's status as an ex-offender and upon three incidents involving McClindon which occurred prior to the issuance of the stop order.

Two of the incidents occurred in August, 1981, and involved McClindon failing to produce "proper" identification when requested to do so by security personnel. On the second of these occasions, McClindon entered the visiting room without permission. When confronted by a security guard he said he "was tired of this bullshit" and walked out of the institution.

The third incident involved a phone call McClindon arranged between his employer and another prisoner at Stateville on September 9, 1981. In order to obtain permission for the call, McClindon apparently represented that the call concerned the Crusoe case. A clerk listened in on the conversation and determined that the call was not relative to the Crusoe case. She so informed her supervisor, who then terminated the call.

Based on McClindon's status as an ex-offender and upon the three incidents, Warden DeRobertis determined that McClindon was a threat to the security and order of the prison and thus banned McClindon from further visits to Stateville.[3] At the injunction hearing DeRobertis testified that prior to the investigation of McClindon, he was unaware of his ex-offender status and if he had known of this status, he would have excluded McClindon on that basis alone. DeRobertis admitted that his primary reason for issuing the stop order was McClindon's ex-offender status. The three inci-

dents, however, provided further support for his decision.

On May 21, 1982, the district court conducted a hearing on Appellant's application for a preliminary injunction. The parties agreed that the record of the preliminary injunction hearing would stand as the hearing on the merits.

At the beginning of the hearing, the trial court articulated the standard to be applied to the stop order. He stated, "Mr. DeRobertis' stop order is valid if it furthers a substantial governmental interest and is not more restrictive than necessary to protect that interest." He added that prison security was just such a substantial interest.

At the close of the hearing, the trial judge announced that *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1973), required her to "give considerable deference to the decision of the Administrator of the institution." The judge then stated that DeRobertis "had a good reason to exclude Mr. McClindon from the institution." The judge then denied relief and stated her findings from the bench:

I also take as as [sic] true the statement of Mr. McClindon's time of incarceration [sic] in Illinois Penal Institutions as correctly stated in Defendant's Exhibit 1 . . . With respect to the other facts stated in Defendant's Exhbiit [sic] 1, I do find that Mr. McClindon did cause a "disturbance" on or about August 1, 1981, more likely late July 1981—if there is any confusion about the date—with respect to entering the visitor's room without authorization, and that did constitute a disturbance. I further find that with respect to the telephone calls set up by Mr. McClindon on or about September 9, 1981, that Mr. McClindon did misrepresent the purpose of that telephone call and that that con-

---

**3.** McClindon was apparently excluded under Section I(E) of the Administrative Regulations for the Illinois Department of Corrections:

A visitor may be excluded for any of the following reasons: (1) security requirements; (2) space availability; (3) disruptive conduct; (4) being under the influence of alcohol or

drugs; (5) refusal to submit to a search; or (6) failure to produce identification or falsification of identifying information. Any visitor who violates a visiting regulation may be temporarily or permanently refused the privilege of visiting a resident.

stituted an incident, as described in Defendant's Exhibit 1.

I further find that Mr. McClindon has repeatedly attempted to visit the institution without proper identification.

I further find that Mr. McClindon is personally—exhibits hostility towards the institution and that this is evidenced in his behavior while at the institution, and on the basis of those facts, I believe Mr. DeRobertis properly issued a stop order preventing Mr. McClindon's continued visitation at the institution.

But more importantly, that the final finding ... that Mr. DeRobertis properly excluded Mr. McClindon from the institution and that his decision must be deferred to, there being nothing in the record that persuaded me that he has exaggerated his response to Mr. McClindon's visits and to the importance of excluding Mr. McClindon from the institution on a security basis.

I believe it as a matter of law is necessary under the facts to defer to the decision of Mr. DeRobertis in this mater. [sic]

## II

At the outset, we note that there is some confusion as to the proper constitutional peg upon which to hang Appellant's claim. It is important to realize that this case focuses on the rights of the Appellant, a prisoner and not on McClindon's rights. Appellant argues that the stop order violated his First Amendment right to communicate with counsel.

We believe Appellant's reliance on the First Amendment is misplaced. Certainly, McClindon's purpose to interview prison clients implicates speech and communication. However, this issue was squarely dealt with and found wanting in *Phillips v. Bureau of Prisons,* 591 F.2d 966 (D.C.Cir. 1979), where the Court stated: "We cannot believe, however, that these ingredients of the interview serve to elevate the prior entry into the prison complex to the status of a First Amendment right...." *Id.* at 975. The court asserted that the "[w]ith-

holding of permission to come into a ... prison" is more akin to an "inhibition of action" *Id.,* than it is to an infringement of speech. "An act does not necessarily take on characteristics invoking the First Amendment simply because if taken it may usher in another episode plainly possessing First Amendment elements." *Id.*

■ Thus, the question of First Amendment rights must be viewed as one of access to a governmental institution. As such, it is apparent that the First Amendment does not provide for a right of access to prison facilities. See *Id.; Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978). *Cf. Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (where the Court found a qualified right of access of the press and public to criminal trials). *See also* Note, *Public Trials and a First Amendment Right of Access: A Presumption of Openness,* 60 NEB. L.REV. 169 (1981).

In addition, as in *Phillips, supra,* it is clear that Appellant has other, though arguably less effective, avenues of communication between him and his counsel and McClindon. Appellant may communicate with his attorney and McClindon by phone or letter. What's more, the stop order only restricts McClindon, not Appellant's attorney. The attorney may still enter the prison to interview Appellant and other clients. As a result, we believe Appellant's First Amendment claim is without substance.

Instead, Appellant's claim is more cognizable under the Due Process right to access to the courts. It is clear that the Due Process Clauses provide that a prisoner must be allowed "meaningful access" to the courts, *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977), quoting *Ross v. Moffitt,* 417 U.S. 600, 611, 94 S.Ct. 2437, 2444, 41 L.Ed.2d 341 (1974), in order to present grievances and "challenge unlawful convictions" and "violations of constitutional rights." *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974). *See Phillips, supra.*

This right of access implies that "inmates must have a reasonable opportunity to seek and receive the assistance of attorneys. Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez, supra,* at 417, 94 S.Ct. at 1814. As such, prison regulations which arbitrarily prohibit the use of jailhouse lawyers, *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) or law students and paralegals, *Procunier v. Martinez, supra,* or which require that attorneys and their inmate clients may only talk by phone while separated by partitions, *Adams v. Carlson,* 488 F.2d 619 (7th Cir.1973) violate the right of access to the courts and are, therefore, constitutionally infirm.

However, "this does not mean that paralegals must automatically be admitted into penal institutions...." *Phillips, supra* at 974. "The extent to which [the right of access to the courts] is hardened by a particular regulation or practice must be weighed against the legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials." *Procunier v. Martinez, supra,* 416 U.S. at 420, 94 S.Ct. at 1815. Therefore, a prison warden may prohibit a prisoner from communicating with counsel through a para-professional where the para-professional poses "some colorable threat to security...." *Id.* Such a determination must be based on the sound judgment of the prison administrator and must not be "arbitrary or patently unreasonable." *Phillips, supra* at 973.

In determining whether McClindon was properly prohibited from entering Stateville, we are guided by the principle that:

> Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

*Procunier v. Martinez, supra,* at 404–05, 94 S.Ct. at 1807–08 (footnotes omitted).

In addition, when reviewing the findings of fact of a trial court, we are bound by those findings unless they are "clearly erroneous." "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court, based on the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Our review of the facts of this case leads us to the conclusion that the findings of the trial court were not clearly erroneous. We therefore affirm the decision of the lower court.

It can be said, almost without question, that prison order and security are legitimate governmental interests. McClin-

don's actions created a colorable threat to that order and security. The incidents outlined above demonstrate that McClindon had little or no respect for prison rules and procedures. In addition, he displayed an attitude of hostility toward the prison and prison officials which, in different circumstances, might have caused serious problems within the prison. Finally, the incident involving the misrepresented phone call further demonstrates that Appellee had reason not to trust McClindon within the confines of the prison. In light of the deference which must be given to the decision of the prison administrator and to the findings of fact of the trial court, we believe McClindon was properly denied access to Stateville.

Our decision finds further support in that Appellant still has access to McClindon by letter and phone. In addition, he may receive face-to-face visits from his attorney. Thus, Appellant's right of access to the courts has not been seriously impaired by Appellee's stop order.

It should be noted that we have been urged to determine whether ex-offender status alone is sufficient reason to bar an individual from access to a prison. However, in light of the facts of this case, we conclude that it is unnecessary to address that issue and, therefore, leave it for another day. Here, it is apparent that the three incidents discussed above provided sufficient justification to bar McClindon from Stateville.

The decision of the lower court is AFFIRMED.