Decided September 11, 1985

310

311

IN THE DISTRICT COURT For The Northern Mariana Islands
FOR THE
NORTHERN MARIANA ISLANDS — By _____
(Deputy Clerk)

TRIAL DIVISION

LAWRENCE M. FLEMING, ) CIVIL ACTION NO. 84-0006
 )
 Plaintiff, )
 )
 vs. ) DECISION
 )
DEPARTMENT OF PUBLIC SAFETY, )
and COMMONWEALTH OF THE )
NORTHERN MARIANA ISLANDS, )
 )
 Defendants. )
_____)

The plaintiff Lawrence M. Fleming brings this action against the Department of Public Safety (Department) and the Commonwealth of the Northern Mariana Islands (Commonwealth) pursuant to 42 U.S.C. § 1983 for infringement of Fleming's rights of due process and equal protection arising out of the defendants' refusal to hire Fleming as a Police Officer I. On June 25, 1985, following a jury trial, a verdict was rendered for Fleming in the amount of $80,000.00. Judgment was entered on this verdict on July 1, 1985.

The defendants now bring a motion for judgment notwithstanding the verdict in which they raise the following issues:

1. Whether 42 U.S.C. § 1983 applies to the Commonwealth and its agencies;

2. Whether this action is barred by the Eleventh Amendment;

3. Whether this action is barred by the doctrine of sovereign immunity;

4. Whether 7 C.M.C. §§ 2702 et. seq. bar this action;

5. Whether Fleming proved a claim under 42 U.S.C. § 1983;

6. Whether this matter was properly tried to a jury;

7. Whether the damages awarded are excessive.

The Court has read the briefs and heard the arguments of counsel and now denies the motion.

I.

Standard of Review

A motion for a judgment notwithstanding the verdict is technically a renewal of the motion for directed verdict and the Court freely determines the legal questions presented by the motion. Fed.R.Civ.P. 50(b); 9 Wright and A. Miller, Federal Practice and Procedure § 2537 (1971)(hereinafter Wright and Miller). In reviewing the sufficiency of the evidence to support the verdict, the Court should only enter a judgment notwithstanding the verdict where:

the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there

can be but one conclusion as to the verdict that reasonable [persons] could have reached.

Simblest v. Maynard, 427 F.2d 1,. 4 (2nd Cir. 1970); Yeaman v. United States, 584 F.2d 322, 326 (9th Cir. 1978). The Court will view the evidence in a light most favorable to the party in whose favor the verdict was made and will not substitute its judgment of the facts for that of the jury. 9 Wright and Miller § 2537.

## II.

### Monetary Damages Against the Commonwealth under § 1983

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The Commonwealth initially argues that 42 U.S.C. § 1983 does not apply within the Northern Mariana Islands. Section 502(a)(2)[1] of the Covenant[2] provides that those laws which are

---

[1] § 502 provides:
(a) The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands . . . :
 . . . .

314

applicable to Guam and which are of general application to the several states will be applicable to the Commonwealth. In support of its contention that § 1983 is not applicable to Guam, the Commonwealth cites an order of the District Court of Guam, Ignacio v. Department of Corrections, Civ.No. 79-00118 (D.Guam, Order dated May 26, 1982), slip op. at 4, which holds that as the Government of Guam has not waived its sovereign immunity by consenting to a suit brought pursuant to § 1983, the Government of Guam is not a "person" subject to liability under the Civil Rights Act. However, this decision, even assuming it to be correct, does not stand for the proposition that § 1983 does not apply to Guam. Rather, it merely holds that the Government is not a proper party defendant to an action for monetary damages. It must be remembered that under the doctrine announced in Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), government officials may be sued as government officials for declaratory and injunctive relief under § 1983. See Edleman v. Jordan, 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974). Additionally, the language of the statute allows suits

_____

<div style="border-top: solid black;"></div>

(2) those laws... which are applicable to Guam and which are of general application to the several States as they are applicable to the several States[.]

2/ Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, 90 Stat. 263, reprinted in 48 U.S.C. § 1694 note.

315

against government officials in their individual capacities for monetary damages. Civil Actions Against State Government § 2.24 (Shepard's/McGraw-Hill 1982). The decision in Ignacio does not rule out such actions.

The language of § 1983 regarding its applicability in the territories is unambiguous. Redress may be sought against any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." Without question this language evidences the intent that § 1983 apply to Guam as well as to the several States. Accordingly, pursuant to Section 502(c)(2) of the Covenant, § 1983 applies as well to the Northern Mariana Islands.

Of course, still unanswered is the primary issue of the liability of the Commonwealth for monetary damages under §1983.[3] Generally, the issue chosen for debate is whether a governmental entity (here, the Commonwealth) is properly considered a "person" within the meaning of the Civil Rights Act. Unfortunately, quite often confused with this issue are the defenses of sovereign and Eleventh Amendment immunity without proper distinctions drawn so as to define and keep separate the independent concepts. Therefore, in determining whether the Commonwealth is amenable to suit under § 1983 for monetary damages, this Court will consider

_____

[3] It can no longer be questioned that the Commonwealth is subject to suit for declaratory and injunctive relief for deprivations of constitutional rights. Edleman v. Jordan, 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974).

316

separately, to the extent possible, the Commonwealth's status as a "person" under the Act, Eleventh Amendment immunity and sovereign immunity.-

A. The Commonwealth as a "Person" under § 1983

Section 502 of the Covenant makes certain federal laws applicable to the Commonwealth "as they are applicable to the several States." Thus, a logical starting point for the determination of whether the Commonwealth is a "person" for purposes of § 1983 is whether or not States are so classified under the Act. However, this approach proves only to be a deceptive lead for the federal courts have not had occasion to decide this issue for the simple reason that the Eleventh Amendment[4] deprives federal courts of jurisdiction over States as defendants. Thus, a court does not have the opportunity to address the threshold issue due to lack of jurisdiction. It is conceded that many district and circuit courts have stated in their decisions that states are not persons under § 1983; however, these decisions uniformly base their holding on the

───────────────

[4] The Eleventh Amendment provides:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign State.

doctrines of constitutional or governmental immunity.[5] Thus, as Judge Hillman noted in An-Ti Chai v. Michigan Technical University, 493 F.Supp. 1137, 1160, "the Supreme Court has never decided whether a State is a 'person' for purposes of Section 1983." Therefore, to begin the analysis, the Court must look back to the history of the Civil Rights Act.

The Court finds persuasive, and adopts, the analysis and conclusions regarding governmental units, including States, as persons, set forth by Justice Brennan in his opinions in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)(Brennan, J., concurring in the judgment) and Hutto v. Finney, 437 U.S. 678, 700, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)(Brennan, J. concurring). These opinions are articulate and well-reasoned and need no elaboration. The

_____

[5] The decisions of the federal courts uncovered by this Court which have found a State or Territory not to be a person all rely on either (or in combination) Eleventh Amendment immunity, see e.g., Glosen v. Barnes, 724 F.2d 1418 (9th Cir. 1984), Neal v. Georgia, 469 F.2d 446, 448 (5th Cir. 1972), common law sovereign immunity, see e.g., Ignacio v. Department of Corrections, supra p.3, slip op. at 4, Toa Baja Dev. Corp. v. Garcia Santiago, 312 F.Supp 899 (D.P.R. 1970) or on the since overruled doctrine of municipal immunity announced in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), overruled in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), see, e.g., Williford v. California, 352 F.2d 474 (9th Cir. 1965), Ohio Inns v. NYE 542 F.2d 673 (6th Cir. 1976), United States v. County of Philadelphia, 413 F.2d 84 (3rd Cir. 1969)(based on Monroe, "conclusion... is inescapable"), Deane Hill Country Club v. City of Knoxville, 379 F.2d 321 (6th Cir. 1967), United States v. Illinois, 343 F.2d 120 (7th Cir. 1965), Aubuchon v. Missouri, 631 F.2d 581 (8th Cir. 1980).

318

Court sets forth the essence of Justice Brennan's theory to the extent it is relevant here.

In support of his conclusions, Justice Brennan draws both upon the history of the Civil Rights Act as well as upon the language chosen by its drafters. Section 1983 was originally enacted as § 1 of the Civil Rights Act of 1871 and was passed pursuant to the enforcement provisions of the Fourteenth Amendment. Quern, 99 S.Ct. at 1182. The Fourteenth Amendment, of course, by its very language was drafted to curtail the power of the States in what was a great remodeling of the structures of federalism following the Civil War. See Ex Parte Commonwealth of Virginia, 100 U.S. 339, 25 L.Ed. 676 (1880). It can be logically assumed then that in enacting the Civil Rights Act, Congress intended that it apply to state as well as to individual action. Quern, 99 S.Ct. at 1153.

The language chosen bears out this conclusion. Created under § 1983 is a federal claim against "any person" acting under color of law who deprives another of rights guaranteed by the Constitution. Two months before the passage of the Civil Rights Act, Congress passed a bill which provided that "in all acts hereafter passed... the word 'person' may extend and be applied to bodies politic and corporate... unless the context shows that the words were intended to be used in a more limited sense." §2.16 Stat. 431. Id. Justice Brennan continues:

> Monell [v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 61 (1978)], held that "[s]ince there is nothing

AO 72

319

in the 'context' of § 1 of the Civil Rights Act calling for a restricted interpretation of the word 'person,' the language of that section should prima facie be construed to include 'bodies politic' among the entities that could be sued." 436 U.S., at 689-690 n.53, 98 S.Ct. at 2035. ... Indeed during the very debates surrounding the enactment of the Civil Rights Act, States were referred to as bodies politic and corporate. See, e.g., Cong.Globe, 42d Cong. 1st Sess., 661-662 (1871)... (Sen. Vickers)("What is a State? Is it not a body politic and corporate?") 99 S.Ct. at 1153-54.

Justice Brennan concluded that "the expressed intent of Congress, manifested virtually simultaneously with the enactment of the Civil Rights Act of 1871, was that the States themselves, as bodies corporate and politic should be embraced by the term 'person' in § 1 of the Act." 99 S.Ct. at 1154. This conclusion is further supported by extensive review of the legislative history of the Act which is undertaken by Justice Brennan in Quern and need not be repeated here. See 99 S.Ct. 1154-1158.

Of course, the attitudes of those members of the Court who together formed the majority on the opinions discussing the language and effect of § 1983 cannot be ignored; however, they present no obstacle to the decision reached today and, in fact, implicitly lend support to this Court's holding. The only direct statement by the Supreme Court on the issue now under consideration appears in dicta[6/] in Fitzpatrick v. Bitzer, 427

[6/] The quoted language regarding § 1983 is not necessary to the decision of the case as the case involves an action against the state pursuant to Title VII and not § 1983 and is accordingly unbinding dicta.

320

U.S. 445, 452, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) wherein Justice Rehnquist wrote:

> The Civil Rights Act of 1871, 42 U.S.C. § 1983, had been held in Monroe v. Pape, 365 U.S. 167, 187-191, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), to exclude cities and other municipal corporations from its ambit; that being the case, it could not have been intended to include States as parties defendant.

96 S.Ct. at 2669. The holding in Monroe relied upon to support the Court's conclusion that States are not subject to § 1983 liability was explicitly overruled in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Accordingly, the statement in Fitzpatrick now rests without foundation.

The Supreme Court has on another occasion addressed the conclusions drawn by Justice Brennan on this subject. In Quern v. Jordan, supra, p.7, Justice Rehnquist, writing for the majority, directly addresses Justice Brennan's concurrence and concludes:

> "[U]nlike our Brother BRENNAN, we simply are unwilling to believe, on the basis of such slender 'evidence', that Congress intended by the general language of § 1983 to override. the traditional sovereign immunity of the States. We therefore conclude that neither the reasoning of Monell or of our Eleventh Amendment cases subsequent to Edleman, nor the additional legislative history or arguments set forth in Mr. Justice BRENNAN's concurring opinion, justify a conclusion different from that which we reached in Edleman. 440 U.S. at 341, (emphasis added).

///

_Edleman_ stands for the proposition that while Congress has the power to waive the 11th Amendment immunity of the States, "such Congressional authorization... is wholly absent" under § 1983. 94 S.Ct. at 1360.[7] The Court distinguished _Parden v. Terminal Railway of Alabama State Docks Dept._, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964) which involved "a congressional enactment which by its terms authorized suit by designated plaintiffs against a general class of defendants which literally included States." _Edleman_, 94 S.Ct. at 1360. Thus, the major focus of the Supreme Court's analysis of § 1983 has been not on liability under the Statute in the abstract but as to whether there has been any waiver of constitutional immunity. Upon closer examination however, it is evident that the proposition that States are persons under § 1983 is a logical and necessary corollary to the theories on this matter propounded by the Supreme Court.

The decisions of the Supreme Court have consistently stated that a State will not be liable in monetary damages under § 1983 absent a waiver by Congress or consent by the State. Of course, the Court has found that, even though Congress had the

---

[7] Justice Brennan arrives at a different result, concluding that the immunity was waived by Congress and/or the States under § 5 of the Fourteenth Amendment. _Hutto v. Finney_, 98 S.Ct. 2578-2580. Of course, this was expressly rejected in _Edleman_ and is not adopted by this Court.

power to so do, pursuant to § 5 of the Fourteenth Amendment,[8/] it did not abrogate the States' Eleventh Amendment immunity in passing the Civil Rights Act. _Quern v. Jordan_, _supra_, p.7, at 1147. Remaining is the issue of consent by the State itself. In _Alabama v. Pugh_, 438 U.S. 781, 98 S.Ct. 3057, 56 L.Ed.2d 1114 (1978), (per curiam) addressing a claim brought against the State of Alabama pursuant to § 1983, the Court elaborated on its earlier Eleventh Amendment holdings and reiterated that,

> [t]here can be no doubt, however, that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit. [emphasis added].

[8/] _Fitzpatrick v. Bitzer_, 427 U.S. 445, 456, 96 S. Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). Section 5 of the Fourteenth Amendment gives Congress the power "to enforce, by appropriate legislation" the provisions of the Amendment. At the hearing on this motion, the Commonwealth, in further support of its position that § 1983 does not apply within the Northern Mariana Islands, argued that Congress has no authority to enforce the Fourteenth Amendment by legislation such as § 1983 as § 5 of the Amendment is omitted from § 501. The Commonwealth misunderstands the purpose of § 501 and its effect on Congressional power. This section is intended "to extend to the people of the Northern Mariana Islands the basic rights of United States citizenship ... and to make applicable ... certain of the Constitutional provisions governing the relationship between the federal government and the States." Covenant Analysis at p.39. "The inclusion or omission of the power to legislate in the specific reference to certain provisions of the Constitution of the United States is not designed to affect the authority of the United States to legislate with respect to the Northern Mariana Islands. That power is governed by Article 1." Report of the Joint Drafting Committee on the Negotiating History at p.C-3 (Feb. 15, 1975), reprinted in S.Rpt.No. 433, 94th Cong., 1st Sess. 405 (1975). Section 105 allows the Congress "to enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands."

AO 72

323

98 S.Ct. at 3057. The ability of a State to waive its Eleventh Amendment immunity to a claim under § 1983 has been acknowledged subsequently by the Supreme Court, Pennhurst State School & Hospital v. Halderman, ___ U.S. ___, 104 S.Ct. 900, __ L.Ed.2d ___ (1984) and by the Ninth Circuit. O'Connor v. Nevada, 686 F.2d 749, 750 (9th Cir. 1982); L.A. Branch N.A.A.C.P. v. L.A. Unified School District, 714 F.2d 946, 950 (9th Cir. 1983); Spaulding v. University of Washington, 740 F.2d 686, 694 (9th Cir. 1984); Hoohuli v. Ariyoshi, 741 F.2d 1169 (9th Cir. 1984); Almond Hill School v. U.S. Department of Agriculture, No. 84-1943 (9th Cir. 1985) slip op. at 6.

It necessarily follows that if a State can waive its immunity from suit under § 1983 and be liable for monetary damages, a State must be a "person" under § 1983; for if a State were not a "person", immunity would not be an issue, as the statute would not apply by its own terms. Adopting this perspective on the problem highlights the confusion which has surrounded this issue. Viewed in this light, however, it is clear that the Supreme Court opinions discussing § 1983 and the Eleventh Amendment support the conclusion reached today.

This Court concludes therefore that, based on the language of § 1983, its legislative history and on the recent Supreme Court decisions which have interpreted it, a State is a "person" liable under § 1983 for monetary damages but may not be brought to answer in federal court absent a valid waiver of its Eleventh Amendment immunity.

324

It follows that, pursuant to the applicability of laws provisions of § 502 of the Covenant, the Commonwealth, like a State is a 'person'. under § 1983.

## B. The Eleventh Amendment

The Commonwealth asks the Court to find that an action in this Court brought pursuant to § 1983 is barred by the Eleventh Amendment.[9/] Section 501 of the Covenant which enumerates the provisions of the United States Constitution applicable to the Commonwealth makes no mention of the Eleventh Amendment. In light of this omission, this Court has previously concluded that "the Covenant expressly rejects the proposition that the Eleventh Amendment is applicable within the CNMI." Island Aviation, Inc. v. Mariana Islands Airport Authority, Civ.No. 81-0069 (D.N.M.I. Memorandum Opinion filed May 26, 1983), slip op. at 16. Accordingly, the Commonwealth cannot seek the protection of the Amendment here.

## C. Common Law Governmental Immunity

The Commonwealth asks the Court to find that even absent Eleventh Amendment protection, its inherent governmental immunity prevents this Court from assuming jurisdiction over an action against the Commonwealth for monetary damages. The Court declines the invitation.

_____

[9/]Although the Commonwealth appears to retreat from this position in its Supplemental Memorandum, at p. 2, the Court addresses the issue for purposes of clarity.

That the people of the Northern Mariana Islands possess sovereignty, or the inherent right to self-government, is not disputed.[10/] The people have entrusted their sovereignty to the democratic government of the Commonwealth through their ratification of a Constitution. Nor do the parties contest that the Commonwealth possesses the attendant attributes of a national sovereign. Whether the ancient doctrine recognized at common law that a government may not to be summoned before its own courts without its consent is one of those attributes need not be decided here.[11/] · The issue here presented, instead, is whether the Federal-Commonwealth relationship embodied in the Covenant allows the Commonwealth to be sued in a federal court for alleged violations of a federal law.

---

[10/] The right of people of trusteeship territories to be self-governing is recognized in Articles 73 and 76 of the United Nations Charter. The right of the people of the Commonwealth to self-government is recognized specifically in Article 6 of the Trusteeship Agreement for the Former Japanese Mandated Islands and in the Preamble of the Covenant.

[11/] The negotiators of the Covenant apparently believed that the Commonwealth would be immune from suit on the basis of its own laws. Marianas Political Status Commission, Section by Section Analysis of the Covenant to Establish A Commonwealth of the Northern Mariana Islands, at p.11 (Feb. 15, 1975). But see, Maruyama & Associates, Ltd. v. Mariana Islands Housing Authority, Civ.No. 82-0066 (D.N.M.I. Decision filed May 24, 1984) slip op. at 3-4 (questioning modern application of "monarchistic doctrine" of sovereign immunity), quoting Civil Actions Against State Government, § 2.6, p.22 (Shepard's/McGraw-Hill, 1982).

As did the people of the original States in the ratification of the Constitution, the people of the Northern Mariana Islands in drafting and approving the Covenant relinquished a degreee of their sovereignty to the United States.[12] The Supreme Court, as discussed above, continues to struggle with the parameters of the sovereignty which the states ceded to the federal government. Hamilton has suggested that the States retained that sovereign immunity which they did not surrender "in the plan of the Convention." A. Hamilton, The Federalist No. 81, p.487 (C. Rossiter ed. 1961). This suggestion offers a logical and convenient framework with which to begin this analysis. Accordingly, the Covenant will be examined to determine what, if any, sovereign immunity the people of the Commonwealth surrendered in establishing a political union with the United States.

This analysis begins with a review of Section 501. As noted above, in Section 501 is enumerated those provisions of the United States Constitution which "will be applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several States." What follows are the specific clauses

_____

[12] Section 101 of the Covenant provides:

The Northern Mariana Islands... will become a self-governing commonwealth... in political union with and under the sovereignty of the United States of America.

AO 72

of each Article and/or Amendment which are adopted. From the specificity with which those applicable portions are identified, it is readily apparent that the drafters reviewed each and every clause of the Constitution to determine the appropriateness of inclusion in Section 501. Accordingly, it must be concluded that the omission of the Eleventh Amendment from Section 501 was the result of a conscious decision made by the drafters. "[I]n an instrument well drawn, as in a poem well composed, silence is sometimes most expressive." Chisolm v. Georgia, 1 L.Ed. 440, 455 (1793)(Wilson, J., concurring). The inference that the drafters intended that the Commonwealth be amenable to suit in federal court is inescapable.

Nonetheless, the Commonwealth is determined to avoid this inference. In brief and at the hearing, the government argues that the adoption of the Eleventh Amendment did not alter the meaning of Article III, but merely clarified the original intent of the framers that the federal judicial power was not to extend to cases or controversies in which a State was a defendant. Thus, the Commonwealth contends, the omission of the Eleventh Amendment from the Covenant is irrelevant regarding the power of this Court, as Article III itself prohibits the assumption of jurisdiction over the unconsenting Commonwealth as defendant. While the Commonwealth's theory regarding the Eleventh Amendment is not without support, see, L. Tribe, American Constitutional Law, at 130-131 (1977), the conclusions which the government asks us to draw are not logically necessary

nor are they persuasive.

Initially, whatever the historians or legal scholars choose to consider, the genuine, true or original meaning of the language of Article III is academic in light of the events which transpired regarding Article III and the Eleventh Amendment. In Chisolm v. Georgia, 1 L.Ed 440 (1793), the Supreme Court interpreted Article III to allow suits against a State in federal court. "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must, of necessity expound and interpret that rule." Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803) (Marshall, C.J.). Chief Justice Warren comments that Marbury "declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by the Court and the Country as a permanent and indispensable feature of our constitutional system." Cooper v. Aaron, 358 U.S. 1, 18, 78 S.Ct. 1401, 1409-1410 (1958). Thus, Chisolm never having been overruled, Article III must be interpreted as extending the federal judicial power to cases wherein States are defendants[13]; the Eleventh Amendment, not Article III, protects the states against such action.

_____

[13] If Art. III were as the Commonwealth reads it, query--how then would federal courts have jurisdiction even over consenting States; yet they clearly do. Florida Dept. of State v. Treasure Salvors Inc., 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982).

The implicit intent of the drafters simply does not allow the adoption of the Commonwealth's theory. Had the drafters intended that this Court's Article III jurisdiction[14] not extend to actions wherein the Commonwealth is a defendant, why not include the Eleventh Amendment? Even though the Supreme Court has been unwilling to extend the protections of the Amendment beyond bona fide States[15], it is certainly arguable that as the constitutional provisions specified in § 501 apply to the Commonwealth as "if it were one of the several States", inclusion of the Eleventh Amendment would have afforded the Commonwealth the protection it now desires. Moreover, what little legislative history there is on Section 501 indicates that the interpretation the Court gives its jurisdictional grant today fully comports with the structural relationship intended by the drafters.

The Senate Committee Report relating to Section 501 of the Covenant[16] evidences a concern for the prevention of abuses

---

[14] This Court exercises the jurisdiction of a district court of the United States. 48 U.S.C. § 1694a(a).

[15] See Lake Country Estates v. Tahoe Regional Planning Agency, 440 U.S. 391, 400, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401, 410 (1979)(In refusing to include a bi-state compact agency within the Amendment's ambit, the Court said that "[b]y its terms, the protection afforded by that Amendment is only available to 'one of the Several States'".)

[16] S.Rep. No. 94-433, 94th Cong., 1st Sess. (1975).

of individual rights by the newly formed government:

> Because the due process clause and equal protection clause of the Fourteenth Amendment will apply to the Northern Marianas as if it were a State, the local government will also have to comply with many of the fundamental provisions of the Bill of Rights in its dealings with the local citizens. In addition, of course, the local government will be bound by the local Constitution and this will provide additional protections for individual freedom.

S.Rep.No. 94-433 at p.76. This position was also taken by the Marianas Political Status Commission. Covenant Analysis at pp.44-45. While the argument could be made that the Commonwealth intended that it only be subject to actions for declaratory or injunctive relief to guard against such abuses, such a position could not stand. First, there is no evidence that the United States desired the Commonwealth's liability to be so limited. Second and more importantly, the inclusion of the Eleventh Amendment would have subjected the Commonwealth to equitable relief while offering the desired protection. More plausible is the position that the drafters were concerned specifically with the protection of individual liberties and freedoms and by omitting the Eleventh Amendment, fully intended that the Commonwealth be amenable to suit in federal court for monetary damages arising out of the deprivation of a complainant's constitutional rights. Today, this Court so holds.

Lastly, the drafters for the Commonwealth impliedly concede the correctness of what is held today in their analysis of the Commonwealth's sovereign immunity. Regarding Section 103,

331

guaranteeing the right of self-government, the Commission states:

> The Northern Mariana Islands government will be an independent government, like that of the States. For the . same reasons, the Government of the Northern Mariana Islands will have sovereign immunity, so that it cannot be sued on the basis of its own laws without its consent. (emphasis added)

Covenant Analysis, at p.11. Again, the conspicuous absence of any mention of federal court immunity supports the court's conclusion.

In summary, the Court finds it evident that the people of the Commonwealth intended, that "in the plan of the Covenant," they would relinquish a specified degree of sovereignty to the United States under the newly created political union. In order to protect individual rights and freedoms enjoyed under the Bill of Rights, and in hopes of preventing other governmental abuses, the Eleventh Amendment would not be applicable to the Commonwealth; thereby citizens would have the opportunity to summon the Commonwealth before the federal courts to seek redress for deprivations of their constitutional rights: Accordingly, pursuant to the Covenant and to 48 U.S.C. § 1694a, this Court has jurisdiction over actions brought against the Commonwealth for monetary damages pursuant to 42 U.S.C. § 1983.

///
///
///
///
///

332

## II. 7 CMC § 2202

The Commonwealth contends that this action is barred by the Commonwealth's tort claims act codified at 7 CMC § 2202. As the Court finds that immunity from the instant action was surrendered with the ratification of the Covenant, the cited Commonwealth statute cannot rejuvinate that immunity.[17/]

## III. Sufficiency of Claim under § 1983

The Commonwealth contends that the allegations made by Fleming and the evidence introduced at the trial are not sufficient to support a claim under § 1983. In his complaint and throughout the trial, Fleming alleged that the failure to timely establish uniform hiring procedures, the failure to adhere consistently to those procedures which were occasionally developed, and the decision to process Fleming's application in a manner different from the other applicants and in the end the decision to deny him employment deprived him of property and liberty without due process of the laws and denied him the equal protection of the laws. Additionally, the Commonwealth argues

_____

[17/] Section 102, the Supremacy Clause, of the Covenant provides:

The relations between the Northern Mariana Islands and the United States will be governed by this Covenant, which, together with those provisions of the Constitution, treaties and laws of the United States applicable to the Northern Mariana Islands, will be the supreme law of the Northern Mariana Islands

that even assuming a valid claim would lie as against an individual, there is insufficient evidence of a nexus between the deprivation and official government policy to subject the Commonwealth to liability.

## A. Due Process Claims

Under the principles of due process embodied in the Fourteenth Amendment, the government may not deprive a person of life, liberty or property without due process of the law. When addressing claims of unconstitutional deprivations of property or liberty interests, federal courts follow a two-step analysis: 1) does the claimant possess a constitutionally protected interest 2) of which he or she was deprived in a manner not comporting with due process? Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); Belnap v. Chang, 707 F.2d 1100, 1102 (9th Cir. 1983).

The "liberty" and "property" interests are based on broad and dynamic concepts founded in our constitutional framework. The interests protected extend well beyond the literal meaning of the words themselves. Thus,

> "[t]he [Supreme] Court has... made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process. [footnotes omitted].

Board of Regents of State Colleges v. Roth, 408 U.S. 564,

571-572, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). Based upon the evidence introduced in the trial of this matter, the Court remains convinced that Fleming has proved the deprivation of his protected liberty interests.[18/]

 The federal courts have consistently recognized that the freedom to pursue a desired vocation is commanding of a measure of constitutional protection. Phillips v. Bureau of Prisons, 591 F.2d 966, 970 (D.C.Cir. 1979). The "right to follow a chosen profession comes within the 'liberty' . . . concept[] of the Fifth Amendment." Chalmers v. Los Angeles, 762 F.2d 753, 757 (9th Cir. 1985). See also Wells v. Doland, 711 F.2d 670, 676 (5th Cir. 1983)(the "liberty protected... encompases an individual's freedom to work and earn a living"). Quite often, this liberty interest is infringed by an employer's dismissal of, or refusal to rehire, an employee in such a manner so as to "'stigmatize' or otherwise burden the individual so that he is not able to take advantage of other employment opportunities." Bollow v. Federal Reserve Bank of San Francisco, 650 F.2d 1093,

---

[18/] Because a constitutionally recognized 'liberty' interest is found the deprivation of which alone supports Fleming's claim, the Court makes no determination as to the existence of a protected 'property' interest. Compare Chalmers v. Los Angeles, 762 F.2d 753 (9th Cir. 1985)(right to follow chosen profession comes within property concept) with Roth v. Board of Regents, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)(to have protectable property interest in a job one must have more than an abstract need or desire for or unilateral expectation of it.)

1101 (9th Cir. 1981). See also Stretten v. Wadsworth Hospital, 537 F.2d 361, 366 (9th Cir. 1976)(manner of dismissal must not result in "permanent exclusion from, or protected interruption of gainful employment within the trade or profession"). Although the facts here presented do not fall directly on point with this category of cases, the allegations made and proved do show a severe infringement of Fleming's ability to pursue his chosen vocation. It is this infringement, whether in a dismissal setting, a refusal to hire scenario, or in any other context, which is the operative government action.

The Seventh Circuit eloquently summarized:

> The concept of liberty in Fourteenth Amendment jurisprudence has long included the liberty to follow a trade, profession, or other calling. This liberty must not be confused with the right to a job; states have no constitutional duty to be employers of last resort; but if a state excludes a person from a trade or calling, it is depriving him of liberty, which it may not do without due process of law.

Lawson v. Sheriff of Tippecanoe County, Ind., 725 F.2d 1136, 1138-39 (7th Cir. 1984).

Fleming has shown that he desired to pursue a profession as a police officer, and that he was denied the initial step of admission to the police academy. The desire to pursue a career as a police officer has been recognized as constitutionally protectable. See e.g., DiIulio v. Board of Fire and Police Commissioners, 682 F.2d 666 (7th Cir. 1982). Were Fleming seeking the same position in any state of the union, it

may be arguable that denial of employment on one force does not sufficiently foreclose one's opportunity to work as a police officer to implicate liberty interests. For example, a refusal to hire by a city police force would not necessarily foreclose employment opportunities with the county sheriff, the state patrol, another municipal force or even the United States Marshal Service. The situation in the Commonwealth, however, is unique. There exists only one police force for all the Northern Mariana Islands. The nearest force outside the Commonwealth is on Guam which is an unsafistactory alternative for two reasons. First, due to geographical, cultural and societal considerations, employment on Guam for a person from Saipan is not a reasonable alternative. Second, and more importantly, Saipan is Fleming's home and the fact that there may be employment opportunity on a neighboring island or even on the mainland is not sufficient to support a conclusion that employment in his chosen profession was not severely restricted. Rather, because of the unique situation here in the Commonwealth, the Court remains convinced that the Department's refusal to allow Fleming to join the police academy' sufficiently curtailed Fleming's opportunity to pursue his chosen profession and as such constitutes an infringement of his constitutionally protected liberty interests. Of course, such infringement alone is not actionable, rather a determination must be made as to whether the deprivation was accomplished without the requisite due process.

The guarantee of due process has two components, one

"procedural" and the other "substantive." See generally Sirilan v. Castro, DCA No. 83-9009 (D.N.M.I.(App.Div.) Oct. 24, 1984) slip op. at 8-14 (traces development and purposes of substantive due process). The procedural component provides that when a person is deprived of a liberty or property interest, he or she is entitled to notice and a hearing. See Board of Regents v. Roth, 92 S.Ct. at 2707.[19] The substantive element protects persons from government action which is arbitrary or capricious. Justice Harlan has written that the scope of liberty protected by substantive due process "is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints." Poe v. Ullman, 367 U.S. 497, 543, 81 S.Ct. 1752, 1777, 6 L.Ed.2d 989 (1961)(Harlan, J., dissenting).[20] Simply stated, "[t]he Due Process Clause... forbids arbitrary deprivations of liberty." Goss v. Lopez, 419 U.S. 565, 574, 95 S. Ct. 729, 736, 42 L.Ed.2d 725 (1975). More

---

[19] Whether such notice and hearing are required prior to the adverse action depends on a balance of competing interests under the circumstances. Superales v. Appeals Board of the Judicial Council of Guam, DCA No. 82-0192A (D.Guam(App.Div.) Apr. 18, 1984) slip op. at 5, citing Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) and Vanelli v. Reynolds School District No. 7, 667 F.2d 773, 778-779 (9th Cir. 1982).

[20] Justice Harlan's dissenting view stated in Poe was later adopted by the majority of the Court in Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

72
v.8/82)

338

specifically, "[c]onstitutional due process guarantees that no person will be arbitrarily deprived by the government of his liberty to engage .in any occupation." DiIulio v. Board of Fire and Police Commissioners, supra p.25, at 669.

Fleming alleged, and proved, an arbitrary refusal to hire. The testimony showed that thirty persons applied for the position of Police Officer I in 1983. According to the Department's policy then in effect,[21] the names of the applicants were forwarded to a police review commission. The commission recommended that fourteen of the applicants be hired. Fleming's application was placed on hold pending an investigation into "suspected" drug activity.[22] When the investigation turned up negative, Fleming's name was included among those recommended for hire by the commission. The Director of the Department nonetheless refused to hire Fleming because the Director still believed Fleming to be a narcotics dealer. The arbitrariness of such a procedure is evident. Not only is there no evidence that other candidates were subjected to a Drug Enforcement Administration background investigation, but even upon a report clearing Fleming of drug involvement, the Director still refused to hire Fleming

---

[21] As the policy changed throughout the course of the preceding year, not all candidates entering the Academy at that time were required to pass Commission review.

[22] There is no evidence that any other candidate underwent this additional investigation.

AO 72

on those grounds. Thus, not only was there no evidence to support the initial suspicion, the Director took the adverse action based on the suspicion with full knowledge that the allegation was completely unsupported by the federal agency charged with responsibility over such matters. There is sufficient evidence to support the jury's conclusion as to an arbitrary deprivation of Fleming's protected liberty interests.

## B. Equal Protection

Fleming also alleged in his complaint and at trial that in its refusal to hire Fleming, the Commonwealth, acting through the Department, denied him equal protection of the laws. There exists some overlap between the protection offered by the due process clause and that provided under the equal protection clause. "Equal protection demands at a minimum that a [government] must apply its laws in a rational and non-arbitrary way." Ceichon v. City of Chicago, 686 F.2d 511, 522 (7th Cir. 1982). The focus of equal protection analysis, however, is on the differential treatment afforded similar persons in like circumstances. "The guarantee of equal protection... is... a right to be be free from invidious discrimination in governmental activity." Harris v. McRae, 448 U.S. 297, 372, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980). "It is axiomatic that the Equal Protection Clause... guarantees like treatment to persons similarly situated." Desris v. City of Kenosha, Wisconsin, 687 F.2d 1117, 1119 (7th Cir. 1982). Put another way, "[w]hen a

choice is made by the government, the obligation to afford all persons the equal protection of the laws arises." Kirchberg v. Feenstra, 609 F.2d 727 (5th Cir. 1979). Lastly, it is undisputed that "the constitutional mandate of equal protection extends to discriminatory executive or administrative conduct as well as to discriminatory legislation." Jackson v. Marine Exploration Co., Inc., 583 F.2d 1336, 1347 (5th Cir. 1978).

The facts recited above, ante p.28, regarding the treatment accorded Fleming during the recruitment and application process also support his equal protection claim. Fleming, along with the twenty-nine other applicants whose applications were reviewed by the review board, was treated differently than other applicants hired earlier in the year who were required only to interview with the Chief of Police or the Department Director. While this alone may not necessarily show discriminatory treatment, it adds support when viewed in conjunction with the other evidence. Fleming alone was subject to a DEA background investigation. Moreover, Fleming was the only applicant recommended by the review board yet refused employment by the Director. This evidence establishes a prima facie case of purposeful discrimination.[23/] "[E]ven an isolated event may con-

_____

[23/] Discrimination, to be actionable under the equal protection clause must be intentional. Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). However, such intent may be inferred. Smith v. State of Georgia, 684 F.2d 729 (11th Cir. 1982). The Commonwealth does not challenge the jury's implicit finding of the requisite intent (set forth in Plaintiff's Jury Instruction No. 7 as an essential element of the claim). Moreover, there is ample evidence to support the finding.

AO 72

341

travene the equal protection clause if different action is taken against persons similarly situated without showing any rational basis for the disparate treatment." Smith v. State of Georgia, 684 F.2d 729, 736 (11th Cir. 1982). Upon the presentation of a prima facie case, the burden shifts to the Commonwealth "to dispel the inference of intentional discrimination." Castaneda v. Partida, 430 U.S. 482, 497-498, 97 S.Ct. 1272, 1282, 51 L.Ed.2d 498, 512 (1977). Furthermore, "it is established that mere protestations of lack of discriminatory intent and affirmations of good faith will not suffice to rebut the prima facie case. ...A defendant must introduce evidence to support its explanations." Jean v. Nelson, 711 F.2d 1455, 1486 (11th Cir. 1983). Here, the government offered no sufficient justification to support its actions. The jury's findings of purposeful discrimination is supported by the evidence and justifies the conclusion that Fleming was denied the equal protection of the laws.

<div align="center">C. Governmental Policy</div>

A government is not liable under § 1983 solely on the basis of respondent superior for the torts committed by its employees.

> Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

342

_Monell v. Department of Social Services_, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-2038, 56 L.Ed.2d 611 (1978). The Commonwealth cites this language in support of its contention that it cannot be held liable for the acts of the Department or its employees absent evidence of some official policy which inflicts the injury. In further support, the Commonwealth cites _City of Oklahoma City v. Tuttle_, ___ U.S. ___, 53 L.W. 4639 (1985) to bolster its contention that official policy was not the cause of the injury.

Turning first to _Tuttle_. On brief,[24/] and during oral argument, the Commonwealth argued that _Tuttle_ prohibits the finding of § 1983 liability based only upon the showing of a single incident of unconstitutional activity; since Fleming alleges only such one act, the Commonwealth concludes, no liability is permissibly imposed. However, this is not what _Tuttle_ holds. In _Tuttle_, the respondent brought an action against the petitioner, Oklahoma City, pursuant to § 1983 for the killing of her husband by a rookie city police officer. A jury's verdict in favor of the police officer but against the city for $1,500,000.00 was upheld by the Court of Appeals for the Tenth Circuit. The Supreme Court reversed.

---

[24/] See Memorandum of Points and Authorities in support of Commonwealth's Motion to Reconsider (June 20, 1985) at 3-4.

AO 72

343

Referring to <u>Monell</u>, the Supreme Court reiterated the earlier holding that a government may not be liable absent some nexus between the injury and official government policy. The question presented in <u>Tuttle</u> was "whether a single isolated incident of the use of excessive force by a police officer establishes an official policy or practice of a municipality sufficient to render the municipality liable for damages under 42 U.S.C. § 1983." 53 L.W. 4642, n.2. Even though there was evidence of policy and inadequate training, the Supreme Court did not consider it because the court's instructions allowed the jury to infer, from a single incident of excessive force, inadequate training or supervision; based on this instruction alone, the Supreme Court reversed. While municipal liability may be established by proof of a single incident where such proof includes "proof that it was caused by an existing, unconstitutional municipal policy[] which can be attributed to a municipal policymaker," <u>Id.</u> at 4643, such policy may not be inferred. Thus, the Court did not, as the Commonwealth contends, turn away cases wherein only one unconstitutional action was shown. Rather, the Court merely reasserted a <u>Monell</u> requirement that a nexus between the unconstitutional act of a non-policymaker and official government policy be demonstrated.

Here, this Court is convinced that the actions in question represented the official acts of the Commonwealth government. The unconstitutional conduct was carried out by the Director of Public Safety and/or the Chief of Police. Both

officials are high in the government's organizational hierarchy. This Court has held in an earlier § 1983 action that the "acts and edicts" of a Commonwealth agency director "unquestionably" represent the official policy of the government. Island Aviation, Inc. v. Mariana Islands Airport Authority, Civ.No. 81-0069 (D.N.M.I. Memorandum Opinion filed May 26, 1983) slip op. at 15. This conclusion is supported by language in Tuttle. Quoting Thayer v. Boston, 36 Mass. 511, 516-517 (1837), the Court writes:

> "As a general rule, the [municipal] corporation is not responsible for the unauthorized and unlawful acts of its officers, though done colore officii; it must further appear, that they were expressly authorized to do the acts, by the city government, or that they were done bona fide in pursuance of a general authority to act for the city on the subject to which they relate[.]" [emphasis added]

Tuttle, 53 L.W. 4642, note 5. The Supreme Court concludes that Monell's policy or custom requirement "should make clear that, at the least, that requirement was intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decision-makers." Id. [emphasis added.]

Here, the Director's policymaking capacity and general authority to act on behalf of the Commonwealth are clear. The Director is appointed by the Governor with the advice and consent

///

///

of the Senate.[25] He or she is the "administrative officer of the Department"[26] and is given the authority to employ staff[27] as is required to carry out his or her primary duties which include the provision of "effective police protection to inhabitants of the Commonwealth."[28] That the Director is authorized to recruit and employ police officers and that these actions represent official Commonwealth policy cannot be disputed.

## IV. Jury Trial

The issue as to whether Fleming was entitled to a jury trial on his § 1983 claim is now before the Court for the third time. After initially dismissing the jury demand for lack of a legal claim,[29] on Fleming's Motion for Reconsideration, the Court reinstated the jury demand finding that Fleming's demands were in fact legal in nature.[30] The Commonwealth now brings another

---

[25] 1 C.M.C. § 2502

[26] 1 C.M.C. § 2503

[27] 1 C.M.C. § 2505

[28] 1 C.M.C. § 2504(a)

[29] Decision Filed April 11, 1985.

[30] Decision Filed June 17, 1985.

challenge to Fleming's right to a jury trial in this action. Conceding the validity of the previous decision regarding the legal nature of .the damages sought herein, the Commonwealth contends that no right existed at common law to a jury in a civil action against a sovereign. Accordingly, the government concludes, Fleming has no such right under the Seventh Amendment in this action.

The starting point of this analysis necessarily begins with the language of the Seventh Amendment:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by the jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

The Seventh Amendment is made applicable within the Commonwealth pursuant to Section 501 of the Covenant. Any analysis of this Amendment must be "guided by the axiom that the right of jury trial in civil cases is a basic 'fundamental right, and that any seeming curtailment of the right to jury trial should be scrutinized with the utmost care.'" Standard Oil Co. of California v. Arizona, 738 F.2d 1021, 1023 (9th Cir. 1984), quoting In Re U.S. Financial Securities Litigation, 609 F.2d 411, 421 (9th Cir. 1979), cert. denied 446 U.S. 929, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980).

The Amendment's "Suits at common law" refers to the common law of England in 1791, the date of the Amendment's adoption. 9 Wright and Miller § 2302, at 14 (1971). As the

terms of the Amendment preserve, and do not grant, the, right to a jury trial, courts undertake a historical analysis to determine whether the action. at issue would have been triable to a jury at common law. The Ninth Circuit has developed a two-step test for determining the historical right to jury trial: "are the issues to be tried legal and, if so, are the issues the sort that would have been tried to a jury in England in 1791." Standard Oil Co. of California v. Arizona, supra, at 1027. This bifurcated analysis is necessary because the legal-equitable distinction does not end the analysis; quite often at common law, legal issues were nonetheless tried by the judge and not by the jury. Not only were legal issues such as jurisdiction, venue and witness competence tried by a judge, but, important here, "inquir[ies] concerning the right to jury trial in legal actions in England in 1791 could also turn on matters such as sovereign immunity which are extraneous to the legal-equitable distinction." Standard Oil Co. of California v. Arizona, supra, 738 F.2d at 1026.

The Commonwealth does not challenge, nor does the Court question, the previous decision finding that Fleming seeks damages of a legal nature pursuant to § 1983 which, as a preliminary matter, entitle him to a jury trial; the first part of the test is met. Can, however, the Commonwealth set up its own sovereign immunity as a bar to a jury trial?

The Supreme Court has consistently held that in actions against the federal government there is no right to a jury trial,

save for the government's consent, for there were no actions against the sovereign in common law. McElrath v. United States, 102 U.S. 426, 26 L.Ed. 189 (1880); Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943); Lehman v. Nakshian, 453 U.S. 156, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981). Unfortunately, the Court has not had occasion, as far as can be determined, to set forth standards by which to determine the extent and nature of a State's or Territory's sovereign immunity and the effects on the Seventh Amendment right to jury trial. As noted above, the imposing presence of the Eleventh Amendment has rendered further analysis of collateral issues, such as jury trial rights, unnecessary.

Here, however, the issue must be addressed. As a general matter, it is well settled that when a State chooses to waive its sovereign immunity, it may freely condition and limit the nature and form of the action filed against it. Civil Actions Against States, supra, p.5, § 3.5. Quite often a State, for example, will permit actions against it before a judge, but not a jury. See, e.g., 7 C.M.C. § 2253 (actions against the Commonwealth permissible under local law to be tried by court without a jury). The ability to so condition a waiver necessarily derives from the States authority to deny any consent altogether; unquestionably, the authority to grant waiver necessarily includes the power to offer a partial or conditional consent. Thus, where sovereign immunity is not a bar to the action altogether, the court must examine the nature of the

AO 72
(Rev. 8/82)

waiver itself to determine whether it also encompasses the question of jury trial. See, e.g., Lehman v. Nakshian, supra p.38, at 2702 (Age-Discrimination in Employment Act substantially abrogates State sovereign immunity and allows jury trials whereas the statute limits suits against the United States to court trials).

The Commonwealth has waived its sovereign immunity from suit in federal court for federal claims. See II.C. supra. The issue here becomes whether this waiver is so conditioned so as to subject the Commonwealth to trial before federal judges only. There is no evidence that the waiver was in fact so conditioned. As was concluded above, the drafters made a conscious decision to subject the Commonwealth to liability for violation of federal statutory and constitutional law. In 1974, the Supreme Court definitively held that actions enforcing federal statutory rights carry with them the right to jury trial. Curtis v. Loether, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). Justice Marshall's unequivocal statement of the holding is worth repeating here:

> Whatever doubt may have existed should now be dispelled. The Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in ordinary courts of law.

94 S.Ct. at 1008. Thus, it should have been clear to the drafters that jury trials would be available in legal actions against the Commonwealth; yet no attempt to condition the waiver

is anywhere evidenced.

Moreover, the concept of jury trials in the Commonwealth was by no means ignored. The Northern Mariana Islands delegation expressed great concern over the use of juries in general. They decided that the legislature should be given the opportunity to review the desirability of jury trials in general and to "mold the procedures to fit local conditions and experience ." Covenant Analysis at 46. Accordingly, Section 501 includes the proviso that "neither trial by jury nor indictment by grand jury shall be required in any civil action or criminal prosectuion based on local law, except where requried by local law."[31] [emphasis added] In discussing this provison, the Status Commission concedes that "[f]ederal cases, however, will have to be tried before juries when required under federal law." Covenant Analysis at p.46. Likewise, the Senate Committee Report emphasizes that the jury trial provision "exempts proceedings in the local courts--except where required by local law--from the requirements of... trial by jury." Report No. 94-433, supra, p.20, at 74. Rather than extending this limitation on jury trials to the federal court, the drafters explicitly limited the

-------

[30] Art. 1, Sec. 8 of the Commonwealth Constitution provides:

The legislature may provide for trial by jury in criminal or civil cases.

Local law currently allows for jury trials in civil cases wherein the amount in controversy exceeds $1,000.00. 7 C.M.C. § 301(b)(1).

provision to local courts. It can be safely assumed that the drafters were aware that federal statutory rights claims include jury trial entitlements and decided not to curtail this right by a condition of its waiver of constitutional immunity under Section 502. Accordingly, under the test set forth in Standard Oil Co. of California v. Arizona, supra p.36, § 1983 includes a Seventh Amendment right to jury trial and such an issue would have been tried to a jury in 1791, there being evidenced a waiver of sovereign immunity. The trial by jury was proper.

## V. Damages

Finally, the Commonwealth argues that the verdict awarding damages of $80,000.00 is excessive and calls for a new trial. Where it is difficult to measure a person's injury in monetary terms, the Court is reluctant to disturb a jury award which is not unreasonable on its face. Parker v. Shonfeld, 409 F.Supp. 876, 879 (N.D.Cal. 1976). A jury's verdict will not be set aside merely because the judge would have awarded a different amount of damages. 11 Wright and Miller, at § 2807. A new trial may be granted only if the verdict is against the great weight of the evidence, or "it is quite clear that the jury has reached a seriously erroneous result." Coffran v. Hitchcock Clinic, Inc., 683 F.2d 5, 6 (1st Cir. 1982); Digidyne Corp. v. Data General Corp., 734 F.2d 1336 (9th Cir. 1984).

In the case at bar, Fleming sought damages for a deprivation of his civil rights, wrongful refusal to be employed

in his chosen career as a police officer and resulting pain, suffering, embarrassment and humiliation. These damages are best assessed by Fleming's peers from this island. This Court is not convinced that the verdict is clearly excessive and denies the motion.

## VI. Conclusion

For the reasons stated herein, the Commonwealth's motion for judgment notwithstanding the verdict or for new trial is DENIED.

DATED this ___11th___ day of September, 1985.

_____

JUDGE ALFED LAURETA